May it please the Court. I'm Robert Powell. I'm here on behalf of the plaintiffs, Gene Sigal and his two children. I would like to reserve two minutes, if I may. I'm going to make that three minutes, given the time. I want to start by just pointing what I think are the seminal cases to consider, and considering this labyrinth of deceit that was visited upon the Court in this dependency matter. And those would be your own court decision in United States v. Ruiz, in which the Court held that by reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. And then I would like to cite Illinois v. Gates, which says that because the magistrate must make an independent evaluation, and the affidavits must provide a substantial basis for determining the existence of probable cause, it is critical to include facts that might undermine the credibility of statements made in the warrant application. In U.S. v. Davis, another U.S. Supreme Court case, the Court held that when truthful answers are withheld that might spur further fruitful investigation, then the warrant is rendered invalid. We have laid out for the Court a plethora of information withheld from these judges who had no involvement with the case whatsoever, but were known to social workers Lee and Weingart. Some of the biggest, of course, is the maternal relative influence, the fact that they were literally on the phone with the child Lola, the secret phone, during a period where they were to have no visits at all because of the court order, and that Lee herself was on the phone with the child the night before. You won't find those in the statement of cause. It was a downgraded referral as to S.S. I mean, S.S., by and far, there's not a scintilla of probable cause for the removal of S.S. in that initial warrant. Well, can I ask you, just set aside that issue for warrant 1 as to S.S., and just look at warrant 1 as to L.S. and warrant 2 as to S.S. Why aren't the threats of suicide as to both of them sufficient to establish probable cause, even if we assume that there were things that should have been included or corrected in the warrants? Because, Your Honor, even in the throes of a dependency case, social workers have to adhere to all the same law that this court has set down in Wallace v. Spencer, Rogers v. San Joaquin County, and that's memorialized in Welfare and Institution Code Section 387, which is what they eventually ended up filing after the fact. I mean, but what difference does it make whether the maternal family is having undue influence on the kids if at the moment the child says, if you send me back, I'm going to commit suicide? Why isn't that enough to remove the child, even if, you know, they should have mentioned about the maternal parent's family's influence? Because you're talking about invading a fundamental liberty interest that the father has, and they even lied about what he would have done with his interest, which was he authorized the continued voluntary hold of the child. He authorized putting the child somewhere else. When you withhold that kind of information from the court, that's critical information to the decision of, oh, should I remove this child from the custody, legal and physical, of this father? So you're saying that if that had been added, they would have, the court would have taken the risk of sending them back and see if they commit suicide? That's what I don't understand. That would have made a difference, and they would have been denied? That's the smoke screen, Your Honor, because had they told the court that Mr. Segal was fine with not having the children return to his home or him moving out of the home so that his sister or they could stay with these other two family friends, which is common in the juvenile court system, had those things been said, then there wouldn't be a reason to remove the children from father. This was handled completely unlawfully because this statement of cause doesn't just have a little bit of lying. It has an outrageous amount of lying, and this court in Hardwick v. County of Orange, my case, said a minor bit of perjury is not acceptable, a minor perjury. There is no such thing is how the Hardwick court described it. So, yes, I think we would have had... The question is, what of the information that dealt with the immediate situation? There were certainly some mistakes, misrepresentations even, as to earlier. Ms. Burton, forgive me for interrupting. Yes. I'm getting as loud as I can get you here. Well, I don't know why, but can you hear me now? Yes, I might actually hear you. Okay, fine. I've had problems in the past, but not recently. I don't know if there's anything I can do with this. Anyway, what is there as to the immediate situation that was either a misrepresentation or an omission? Not all the old stuff, as to which there were definitely misrepresentations and omissions, but as to the immediate situation, which Judge Collins is focusing on, that would have detracted from what was reported about the children's actual reaction to coming back to their father. Remember, the primary treating therapist at DeLama was a Dr. Abdullina. Dr. Abdullina said, and Lee knew, that he felt that this was all just a ruse by Lola to get back to her aunt. And that's in fact, I mean, she says that herself. So Dr. Abdullina says it. The PMRT, who responds to the school, and Lee knew about this, had indicated that the kid was, they just had to take her because she was repeating it. She had trouble believing it, which had the judge known that the PMRT and Dr. Abdullina didn't believe her, knowing that the court had found her. Where could I find that Dr. Abdullina didn't believe her? In the brief, you mean? Well, anywhere. In the record. Dr. Abdullina. Father, it is said in the warrant application that the father said that he spoke to Abdullina and told her that Lola is not suicidal and she doesn't have a game plan. Is that what you're talking about? And also CASA, the CASA Shlodowsky, had also informed Lee of this conversation with Dr. Abdullina. So she was aware. And the PMRT, she was also aware of that through the father. These are kind of critical facts when you're trying to ascertain, is this true? Is this really happening, or do we just have a child who's trying to manipulate her way where she wants to go? Mr. Powell, can I, for a moment, return to the district court's decision and also to the question from my colleagues? And that's on the probable cause issue. So the district court said that here probable cause for removal existed because the considerable evidence in the warrant application is that the children were threatening self-harm, that those threats were linked to placement in Siegel's custody, and that therefore returning to Siegel's custody would place them at substantial risk of harm. The court must determine whether the asserted misrepresentations or omissions, if corrected, would have eliminated probable cause. Then the court goes through that analysis. You seem to be focusing on, you're arguing that the question isn't whether the children should have been removed from Siegel's custody, but whether they could have been placed in somebody else's custody. Is that what you're saying? No, Your Honor. What I'm saying is under the law, Mr. Siegel had all the rights that any of us have right now without dependency in our lives. So that means he has that decision-making authority, which he exercised in saying continue the voluntary hold. So he would have potentially done that. He would have exercised, hey, if the kids are having a problem, I will put them with my sister, Natasha, or Rusty and Tristan. I can't think of their last name right now. So what I'm saying is that is really a red herring, and I can understand why at first glance one thinks, well, wait a minute. These kids said they were going to hurt themselves if they went back to dad. That gives you probable cause. I submit it does not because the underlying question is, can you invade the father's rights with lies and obfuscation? And the record is just replete from top to bottom with lies and omissions of material facts. I mean, father was painted as a monster. And if you read what they left out, what they purposely squeaked it through, you can come to no other conclusion but that this was an attempt to not just fool the court but to maneuver oneself in front of a judge who doesn't know a thing, doesn't know a thing about this case. That's why Judge Downing returned Sebastian right then and there and as to Lola, as well as Sebastian, said she finds no reasonable efforts were made because it wasn't. Nothing they did was reasonable. I mean, Hardwick and the cases that preceded make clear that you have a 14th Amendment violation for lying in juvenile dependency proceedings. And I'm sure you saw that in the brief. I'm asking this court to make that clear. I think it's already clear because Hardwick found it clear in 2016, I believe. It's a clear violation of my client and the children's rights. Legal question. It seems to me that the, look at Warwick 1. I think I'm looking at Warwick. Some of what it says, and as to the past, seems to me to be not true. For example, it says it was reported that Siegel makes a living by selling drugs. These allegations were concluded as substantiated, and my understanding is they were not. And it says the children were raised by an aunt, and they weren't, and so on. So there were things that were said that were not true. But with regard to the immediate situation, which is what was going to govern the determination to remove the children at that point, I, for example, just looked over what was said about Dr. Avgelina, and I don't read it at all the way you do. It seems to me that it was reported exactly what he said at various times. So, are you, is your legal argument that if lies were told, that's it? If things were said that weren't true, there was a 14th Amendment violation, and it doesn't matter whether it would have actually influenced the result. It doesn't matter whether what you're arguing? It would have actually influenced the result. Yes, I'm saying there is a stand-alone violation. That I'm saying for sure. The comments by Dr. Avgelina are in the brief, and the EOR contains the reference to... Well, it was reported that Avgelina said she didn't have a game plan. Then it was reported that Avgelina said that Lola says she would kill herself, and then later on he says as long as she's saying that, she has to remain under observation, and so on. So, he certainly wasn't saying that there was nothing there. No, no, but Your Honor, that's because that's not in what you're reading, the statement of cause. No, it is. It is in what I'm reading. No, no, what I mean is... That's what Avgelina stated, as long as she expressed this idea, she will remain under observation. Elsewhere in the brief, Your Honor, we give you the citation of what Dr. Avgelina discussed with Mr. Slodowski and Mr. Sehgal. And it is very relevant to know that this treating therapist thing, basically, I think she's faking it. And especially, when you talk about the circumstances right now, it's so important to understand that they tried to use these therapists, and what they keep repeatedly saying, independent people, but they did not tell them any of this background, this underlying facts. They don't know that the maternal relatives were on the phone, because then, these therapists, just like a judge, might have said, hey, what, I want to know more. Like Vasquez said, she said, I would want to know everything I could about the situation. But these therapists could not, because Lee and Weingart had their ear, did not tell them the story, did not tell them of the recent events, of the recent most report. I think it's telling, Your Honor, that there's three evaluations. The most recent one, not mentioned at all, in the SOC. The court found, by clear and convincing evidence just weeks before, that these children should be returned to their father. There will be no substantial detriment to these children. To not tell this judge who knows nothing, those kinds of facts, is to absolutely poison the well. And there's every sign that this was done because of their vendetta. ECFS can tend to pick a horse and back the horse through thick and thin. And two years spent with a family that they said in December 2013 should be the children removed from, tells you that they were backing that horse. May I, we've passed my rebuttal time, Your Honor. Yes, thank you. Your Honor, it's Avi Berkowitz on behalf of the respondents, the county social workers, Lee and Weingart. So I think the key in this case, really, I think really the key, is we're dealing with two children who expressed suicidal ideation. And it's not just that, not that they just expressed it. You have multiple mental health care providers from the county of Los Angeles, one of whom, two of whom actually observed her. Psychiatrists from different hospitals, minors, a specially assigned advocate, there was a special advocate, all expressing concerns about suicidal ideation. Tell me about the Warrant 1 as to SS. Because at that point there wasn't a suicide threat as to SS. And it seems that even the uncorrected warrant application was pretty thin. And so why shouldn't we conclude that if the corrections are made, that that warrant, you know, that that's material and that warrant then would be, might have had a different outcome? Well, first of all, Your Honor, I can address that. One is it does mention that Sebastian's issues with respect to him having difficulty adjusting to his father's home and all of the different concerns he had, seeing his sister, going through the suicidal intent herself. And if the court is concerned about, well, what about these other issues prior, back in 2013, I would ask Your Honor to note that when it comes to this Warrant 1 for the minor, for the boy, what happened, the magistrate at that time agreed. And when the judge who was the dependency judge, Judge Downing, he, as Mr. Powell even mentioned right now, said that there was good cause for matter. He just found that there wasn't enough to keep Mr. Siegel away from his child. But here's what happened. Later, when that eventually continued on, what happened, this judge, the same judge, kept Mr. Siegel away from both children when the second warrant went through. So what that shows is, what are we talking about? An issue of keeping the minor away from the child from Mr. Siegel? So on the first warrant, your argument is that the harm was emotional. It wasn't any kind of physical harm as to SS, either from self-harm or from his father. It's emotional harm? Well, he did not say self-harm at the first time of the first warrant. That was his sister. That part is true. But he is saying he had been hit before. In fact, he even said that in his deposition testimony. That's what he had told people. That was never established. He said that in his deposition. He even said, this is what I had told people. So whether we're going to argue about whether he had actually been hit before or any of those matters, we're talking about for probable cause, Your Honor. We're talking about just information that the social worker has a belief to put that in front of the magistrate and enough probable cause. We're not talking about a higher standard here of clearing convincing. We're not talking an issue here about anything else other than the information that went into that warrant, even for Sebastian. That was enough in there for the courts to even be concerned for there to be an actual sustaining at that issue. Because what happened? The minor was, in fact, noted to be in danger, in problems. And that's what he said. But I'm not saying that he actually had a suicidal ideation at that time. I'm not trying to say that. That did come later. So what exactly in the first warrant referred to, aside from things, the historical materials, some of which wasn't true, but as to the immediate situation, what was said about SS and why was it enough by itself? I'm sorry, you're asking me why was— Why was what was in the warrant enough by itself? Because of the emotional distress that the child— What was in the warrant? First of all, as far as I can tell, it's after a lot of talking about Lola on and on and on. At the end, it's material about the fact that Sebastian, Mr. Whisper, his father doesn't hear him. I don't know whether the story about him asking for the address is in the warrant application or not. Do you know whether it is? I'm looking at the record, Your Honor. It's 7-48. There are statements that the social worker is getting from the child, sobbing hysterically, shouting over the phone, yelling and screaming, get out, I need to get out. He's crying hysterically. I want to go home now. And there's that paragraph, Your Honor, if you see in 7-48, and talks about that was just the interview with him. And then there's a discussion. And, again, there's discussion about how the social worker went out and noted all the favorable things for Mr. Seagal as well, in terms of they went out furniture shopping and things of that nature. The bottom line, Your Honor, is that there is evidence exactly here in the warrant about what happened with Sebastian and him claiming the 911 call, if you see on 7-49, where he talks about he's very anxious and he needs a code word to call the police. That's in the bottom of 7-49. So although, again, I concede Sebastian is not stating that he's trying to kill himself, he's expressing real serious issues. If a child at this age, who is certainly verbal, 9 or 10 years old, is sobbing hysterically, wanting to get out, is hysterical, screaming on the phone, saying that he doesn't want to live with his father, and there's like a code for calling 911. And if you remember later, the foster parent who took the child over said that the child was walking around with a baseball bat, saying he was actually legitimately frightened and shaking. So I think we have a lot here. I'm sorry. I'm just saying that was later. That was later, but that's corroborative evidence to show that this child was in fear of his father. At least he was expressing it at the time. And it's so simple to say, just on Monday morning quarterback, yeah, everything is fine here, you know what? The social worker shouldn't have done this. The social worker was just trying to get the father, and yeah, this child wasn't really expressing any type of harm or any type of concern. And that's really easy to second-guess and say that. But number one, the law doesn't allow for that. The law allows that all that has to be done is the probable cause, which the cases cited in the brief reflect that. But second, how many times have social workers dealt with these types of cases where there's a big concern, and then there's allegations they ignored it, and if something bad happens, they get in trouble. So no matter what they do, the social workers are going to be blamed. Now, the plaintiffs in this case are going to argue, of course, for advocacy for their position, because Mr. Siegel claims, well, the social workers didn't see it his way, and they didn't get all the information that's favorable to him. So what they wanted, basically, was kind of a manuscript that was favorable to him. But when the social worker is dealing with two children, and one of them, where your Honor is pointing out, okay, one of them is saying, I want to get out. He's screaming, he's yelling, he's concerned. Now, plaintiffs are going to say, well, he's enmeshed with the other child. He's got influence. Okay, fine, those are arguments. But the social worker is dealing with concerns about a child in real time who wants a code to call 911, who's concerned about his well-being. I have a question. For a limited time or permanently, what was the circumstance? Of what? Of the circumstance of what? Of the removal. For the child? Yes. For Sebastian, right? Right, yes. The circumstances were that what happened was that both children were placed with the father, and at the time the sibling had expressed suicidal ideation. That's not what I'm asking you. I'm asking you, when they were removed from the father's custody, was there at that point an understanding that it was permanent, temporary, et cetera? There was no understanding of permanent. It was just an immediate relief. You remove the children from the home, and at that immediate time, they went to another foster parent, but it wasn't permanent. In fact, you'd have to have some type of substantiated or sustained petition for something to go forward with that. It was just a temporary matter, and, in fact, that is supported by the evidence. It was not permanent. It was just in order to avoid the harm. Before a judge, basically. Yes, Your Honor. And when he went before the judge, the judge did put him back. Temporarily, yes, Your Honor. At that point. Yes, Your Honor, at that point, yes. So if I'll just follow up a little bit more on this. So what we're talking about is the evidence of what the social workers knew at the time, and what they put in there was accurate. And any claimed inaccuracies about even raising the child, as Your Honor noted, or things of that nature, that wouldn't make a difference. We're talking about something really substantial. We're talking, again, at its core, we're talking about children who are claimed suicide, at least in three of the four different issues. We got that. That's a pretty big deal. And the trial court was correct in its analysis, and it methodically went through each of these purported alleged misstatements and talked about all these issues and was satisfied that even if you, which is the law requires, even if you purge the alleged misstatements and the omissions and all of that stuff, what do you have left? You have left here a valid good warrant based on simply those particular issues. What about the contention that the children could have been or should have been placed in the custody of a relative of Mr. Seagal? I'm sorry, Your Honor. Mr. Powell is alleging that right now in oral arguments, but in terms of his claim and even admits it, and he can say so differently in rebuttal if I'm wrong, his argument is that the child was taken away, the children were taken away from the parent. His argument is not that he has a constitutional right because it went to someone else and not his relatives. That's not what he's claiming. So that's my response to it is that he is saying that argument, but that has nothing to do, there's no nexus there. Was that argument made below that the children should be placed in the custody of his sister or some other relative? But, Your Honor, was it? I'm sorry. No. Was that an argument made to the district court? It was an argument not in itself as a constitutional violation. It was an argument to show alleged conspiracy that the social worker somehow conspired with the family in order to get these two children into the sister and into the other relatives, not to go to the paternal relatives. But there was no allegation that in itself, if you look at all the briefing, that that in itself was the alleged violation for any of the warrants that we're talking about. And, in fact, I would say here with respect to what happened, when these two children, there were warrants here, I think this is very telling, PCFS wasn't advocating that they go back to the maternal relatives. Who did they end up going with? They went to some person who happened to work with the maternal relative who had no connection, it's undisputed in the record, had no connection to her, wasn't friends with her, and never went back to the maternal relatives. So that, in fact, belies their argument that there was somehow some conspiracy or went forward in somehow to go against Mr. Siegel. That's not what the evidence is. And I only have a couple minutes here, but I just think, again, it's imperative to note, we're talking about not just what the kids expressed. If they did, that alone would be sufficient. But what we're talking about is, we're talking about numerous health care providers. Dr. Abilegina, I'm sorry if I mispronounced his name, the record there, I think it's 156 and 157 in the supplemental record, reflects his concerns. He admitted this patient. She continued to remain in the hospital for numerous days. Then if you look at Harbor UCLA, I'm sorry, I think it was UCLA, not the Harbor part, but Sebastian was there, and the comments, the record is so replete with their concerns. And now we're going to say, well, this is all made up. I mean, the record from health care providers, beyond even what the kid said, is very concerning. And then you have the child's own special advocate, Vince Sklodloski. I know I butchered his name, but he expressed concern. The 730 evaluator that was mentioned, he expressed concern. All of these people are expressing concern, and now we're going to say, you know what? They're all wrong. They got it all wrong. The social workers needed to adopt the narrative that Mr. Seguil has, and that's just whether the issues are true or not true, which is not the standard. The standard is— I have a question. If summary judgment, this is hypothetical, let's say the conclusion is that summary judgment was not properly granted, then what happens? Then the case would go back, and I assume there would be a trial as to those issues, Your Honor. I don't know if there was more explanation on that. Yes. I think it would be out of remedies in the court. I think it would have to be tried or resolved in some other manner. And I don't have anything else I think I've said, and I don't want to be too repetitive, so I can stop there with 40 seconds. I have a technical question, because I'm looking at this document called Detention Act 133015, and I can't tell—was that attached to the second warrant? What is that document? Because it seems to be—it talks about the court orders of mental health and development, assessment of the children and a bunch of other things, but then it's not signed by the court. It's signed by the social workers, Lee and Weingart. What number, Your Honor? What is that document? Can you just tell me the number and the record? Yes, it's ER801. ER801. I'm going to show what it is. Okay, so I'm looking. ER801. It's 801, but I see it in terms of the—the— The following papers. It's not important. I just was confused. Sorry, just to speed it up. What's the document? I'll try the best I can. I can't answer it. It's called Detention Report 42215. Yes, so the detention report gets filed at the same time as the petition, Your Honor. So what happens is it's not at the same time as the warrant. There's a warrant, and then afterwards there is a petition. But it reads as if it's an order of the court, but it's not an order. It is not an order. If it's a detention report, it's not an order of the court. The only order of the court is the actual warrant, and then there's minute orders. Yes. All right. Thank you very much. We'll have a short rebuttal. Your Honor, let me first speak to the question. I think it was from Judge Cohen. If you do correct the warrant, if you do put in the truth, if you do put in the things you've omitted, what do you have left? The answer to that is what you have left is you have two children manipulating. On that second instance where they've now put Sebastian with his sister in the friend or associate of Poncia, you've definitely feathered your nest for where you want to go as an agency. Also, suicide may be a sexy thing to throw out to get the court motivated to say, hey, I mean these kids were going to commit suicide. First of all, that's false. Remember, on April 6th they threatened all the same things in a room full of mandated reporters. Not a single soul made a mandated report. Lee acknowledges that. It is not a legally sound or a legally appropriate approach to this situation to say that you can lie and lie and lie, leave out the facts that would at least cause a judge to say, hey, what's really going on here? Maybe even say, you know what, you send your application back to Judge Downing, who's been in this case for two and a half years. As for emotional abuse, remember, it's in the pleadings. They did not actually, okay, in the warrant fact sheet when they're setting up to want to get a warrant, they say no emotional abuse. But then you look at these SOCs and they're filled with emotional abuse, emotional abuse. As a practical matter, what you have here is children who have not been in a home for a couple of years. And the only effect of this warrant is to take them out for long enough to get them to a judge, who then puts one of them back temporarily and then asks that later, but not. So, I mean, yes, it's horrible to take a child from their home, but this really wasn't their home for the past two years. Well, the sequelae of events that Mr. Berkowitz spoke about, they kept the children and all of that, those kind of after events, I mean, those are not relevant, of course, to the determination of the probable cause, for sure. They're not. And as I've mentioned in the pleadings, please understand, these children return to full visits with their father within a month or six weeks after being placed with a pastor from a Korean church who sat them down and talked to them. You know, it's this overarching, it's this totality of the circumstances, Your Honor, and the totality of the circumstances in this case are horrific, and you keep an omission of relevant material to this judge. Certainly, Sebastian never should have been removed, but if you look at the underlying problems with the child's credibility, the phone call the night before, and you tell that to a judge, chances are he's going to say, you know what, go work it out. And Dad was willing to leave the child in the facility, and Lee knew that as well. It's all there. There was something you brought up. Police reports. May I? Last thing. Mr. Berkowitz, we addressed in the brief that if you look at the delivered service law and the state of the law, 749 is where they were citing, Lee manufactured that whole thing. In her original notations of that meeting, she said, I felt like the child wanted to call the police. That turns into the child wanted to call the police. And that kind of subtlety is what goes through the entire SOC, both of them, because they're very similar. It was a concerted effort, Your Honor. I mean, I know most of that goes to intent and reckless disregard and so forth, but there is no probable cause if you would have told the court the truth. It doesn't exist. Okay, your time is up. Thank you very much. Thank you, Your Honor. Thank you.
judges: Berzon, Katzmann, Collins